Good morning, Your Honor. My name is Vern Woodward. I represent Gerald Hill. To me, this case presents two significant trial issues and a variety of sentencing issues. I'd like to address the trial issues first. Of significance to me is the fact that we have what I perceive to be a very significant Brady violation. This was a case where there were really only two witnesses who mattered. One was the 11-year-old girl, 13 at the time of trial, who testified that my client touched her, and the other was my client who testified that that wasn't so. The day or so before trial, I received an email from the AUSA handling the case indicating that this child, a week or so earlier in a conversation with the U.S. Attorney's Office, had indicated that she had made up a story about a man approaching her and trying to kidnap her or some such thing at school, but that almost immediately the child had recanted to her mother that there was no further involvement. You were able to cross-examine about that and did. Well, you know, that's the government's argument. The government has argued that... Well, you did cross-examine. She went through and said, yes, I lied about it and I wanted attention, and all of that was brought out. That's true and not true, Your Honor. If you read the transcript, you'll see that I was pretty much caught flat-footed when she indicated that this had been more than me lying, that I had actually spoken to the police. I mean, my response was, huh? The police? Because I had no idea that there had been any formal involvement with any law enforcement or school agency. Did you make a motion to continue the case to allow you to investigate more thoroughly this matter? No, I did not. Why? A number of reasons, Your Honor. This is a, as well as a technical legal business, this is a practical business. My client had been under indictment for well over a year, approaching two years. We were in the middle of trial. No, you learned about this a day and a half before trial. Well, what I learned was that there was really nothing to investigate, that she talked to her mom and then told her mom that it was a fib. And I had tried to interview mom and daughter before, but had been refused. I'd asked the U.S. Attorney. But if it was nothing to investigate, then why were you caught flat-footed? You were able to cross-examine her, as Judge Graber has indicated, and get the admissions. Do you have any other issues that you want to talk about as far as the trial? Certainly I do. And I was caught flat-footed because I didn't know there was formal involvement. And if you look at the U.S. Attorney's redirect, it's pretty obvious that she did know because she led her through it question by question by question. How would that have changed what you could argue from, from her admission that she lied? It only, I guess I'm not sure what else you would have done, said, or argued. Certainly, had I known that there had been police involvement, school involvement, school counselor involvement, we would have made every effort to interview those people. And I've never seen a police officer receive a report of an attempted abduction who didn't make a report. I would expect that there would have been materials that would have led to a more effective cross-examination. Now, the second issue concerning the trial deals with the use of my client's pre-arrest, post-Miranda silence. Doyle. Yes. He was requested to come to the police station. He did. He was told that he was... What day was that? Pardon me? What day was he requested to appear at this police station? November 7th, 2003. That was the... Wasn't there an earlier encounter in October? I don't believe there was an earlier encounter. The event occurred in October. But they didn't actually have an encounter with him until November... November 7th, as far as... November 7th, okay. And he was told that he was the subject of an investigation concerning a sexual assault. He, at that time, advised the officer that he had retained counsel and that he was not going to answer any questions. The officer Mirandized him, accepted his invocation of counsel and his invocation of the Fifth Amendment, and then asked simply if he could photograph the residence that my client allowed. No questions were asked. No information was volunteered. At trial, Mr. Hill testified that the photographs which had been taken by Mr. Russell were accurate as far as November 7th, but they were not entirely accurate as to the location of the furniture in the living room on the day in question. The U.S. attorney did not cross-examine him on whether or not he had had the opportunity to explain that. She simply asked him, so they're not the same, how are they different, and he explained how they were different. She then, in rebuttal, called Winfield Russell, who was the officer who had Mirandized Mr. Hill and who had taken the photographs, and testified to the fact that Mr. Hill had not explained to him that the furniture was not in the same position. She then argued in closing that his failure to so notify the police should be considered by the jury and should impact their view of his credibility. Did you object to that argument? No, I did not. So we're reviewing for plain error? We're reviewing for plain error. Did you request an instruction from the court to ameliorate that argument? No, and as Judge Siebel noted, admonishing instructions simply highlight and heighten the jury's attention on the offending material, and that's why I didn't. It seems to me that implicit in Miranda is a guarantee that if you invoke your right to silence, it shan't be used against you, and it seems to me that that's precisely what happened. Let's just assume for a minute that you're correct, that there was doyle error, because it wasn't raised that there was no objection at trial. We review for plain error. Yes, sir. So there's error, the question of whether it's plain, and then substantial rights. So why don't you take me through your analysis of the plain error standard of review? Well, I think you've set it out, Your Honor. Well, just because I've set out the standard doesn't mean it applies, or doesn't mean that you've met it. Well, I think that there is plain error. I think that a Fifth Amendment right is a substantial right. I think in a case as close as this, where the government uses my client's invocation of his constitutional right against him, is inherently prejudicial. I don't know how it could not be. I don't know how anyone could look at this and say that it didn't impact the jury's view of the evidence. And coupled with the other errors in this case, I just can't imagine that it isn't reversible error. And I have about six and a half minutes left, and I'd like to reserve time for rebuttal. Refresh my recollection. Mr. Hill testified in this case. Yes, he did. You're welcome to reserve that for rebuttal. We'll hear next from Mr. Gannon. Good morning, Your Honors. May it please the Court. My name is Tom Gannon for the United States this morning. The Brady claim, I think the district court resolved that the ---- Could you speak a little louder, please? I'm sorry. Yes, of course. I think the district court dealt with this in the motion for a new trial. Actually, I was reviewing the record the day before yesterday back in my office, and I found that I understated the number of times that this matter was brought to the jury's attention. Mr. Woodward used it in his opening argument. He cross-examined on it. He re-cross-examined on it, and he touched on it in his closing argument. The United States, you know, devoted most of the redirect to this matter. So I ---- it was before the jury, and I think he made effective use of it. And I think the jury had some trouble resolving the case, and I think this contributed to the jury's, you know, at least temporary difficulty in reaching a verdict. So I think the district court was correct in denying the motion for a new trial on this basis. On ---- if I'll go on to the Miranda problem, the Fifth Amendment privilege is not like a light switch where you turn it on when it's to your advantage and you turn it off when it's ---- Well, why doesn't Doyle apply here? Explain to me why Doyle doesn't apply. Because once he took the stand ---- That's not what Doyle says, though. Well, I ---- Remember, Stevens descended in that. He's just a defendant. When he takes the stand, he just becomes like any other witness. That's right. And he can be impeached. But that's not what the court adopted. Yeah. That's not the position the court adopted in Doyle. So explain to me why this isn't Doyle error. Well, I think you've got another line of cases which we cite in our brief, Your Honor, the Raffle case, which is fairly ancient, 1926. But that's cited again in 1980 in Jenkins and cited as recently as 2002 in a case called McKeown v. Lyle. And basically it says when you take the stand, you know, and you basically waive your Fifth Amendment privilege not to testify, then you are ---- it's fair game to cross-examine you about your prior silence. That's our position. I can't recall off the top of my head, but in Doyle, did Mr. Doyle ---- did the defendant take the stand in Doyle? I don't ---- I don't ---- Yes, he did. I don't remember. And his silence was used to impeach his credibility. Exactly what happened here. Now, distinguish the facts of Doyle and the holding of Doyle from the facts which occurred here, would you please, Mr. Cannon? Well, Your Honor, it's tough, isn't it? It is tough. And it's tough because, you know, I'm just not familiar with the facts in Doyle. It didn't ---- Well, I mean ---- I didn't come across it in my research. I'm sorry. Yes, I'm sorry. Well, first of all, you have to ---- you know, when I first looked at it, I couldn't quite tell, and that's why I wanted to clarify from counsel. I couldn't quite tell if he had been Mirandized before he ---- before the photos were taken. But before arguing today, I pretty much had, by my reading the record and reviewing the record and looking at the date when he signed that waiver and when the photos were taken, it seems that he was Mirandized before the photos were taken. Yeah. I think that's pretty clear. So then we're now dealing with post-Mirandized statements. Right. Conduct. Yes. So it's not pre. Right. And that's why ---- We know there's a case by the Supreme Court that says that pre-Mirandized statements aren't subject to Doyle limitations. So now we're ---- as far as I can tell, like Judge Baez just alluded to, we're in the world of Doyle, and I'm trying to understand why Doyle doesn't apply. Well, let me give you the facts of Doyle. Let me be entirely candid. I mean, I just ---- In Doyle, the defense ---- I just deal with Doyle, and I don't know about ---- The defense took the witness stand and offered an explanatory exculpation for the charges brought against him, which was selling 10 pounds of marijuana. On cross-examination, the prosecutor impeached their testimony by asking them why they had not explained their conduct at the time of the arrest. It remained silent. The defendants were convicted. Court held that such cross-examination was fundamentally unfair and, therefore, a violation of the due process clause of the 14th Amendment. Doyle applies until you tell me why it doesn't. And at this stage, you know, I must ---- I'd like to move you one step further and ask you to ---- Yes, Your Honor. The review is for plain error here. Right. Well, that's true. That's where I'm headed. I want you to assume, for the purpose of my question, that there was error in allowing the argument to be made that the defendant didn't explain at the time of the photographs that things had been moved. Is that ---- was that prejudicial in the context of this trial? Did that affect the outcome of the case? Well, it's ---- I don't think it did. I think what you had, you had the testimony of the victim, the Samantha Williams, and you had Mr. Hill's testimony. And this was his ---- the story was ---- the stories were so different, I don't think the placement of the computer or the distance of the computer made much difference because he said he was not aware of her. And when he ---- but his ultimate story, and this is the critical part of it, is he said he moved her on the couch because it looked like she was lying uncomfortably. And, of course, she had ---- because he did notice her eventually. And he saw her sleeping on the couch, and he said it looked like she was not comfortable. And, therefore, he admits putting his hands on her to move her around. Now, of course, her story is quite different, that when he touched her, he touched her sexually, both above and below the waist. And that's the critical ---- that's the critical, you know, dispute in this case. Who's telling the truth there? Mr. Hill or Samantha Williams? And ---- So your point, as I understand it, is who cares where the furniture was because everybody admits that he touched her, and the question is in what way. That's correct. So there are a lot of reasons who would care. Why would they not mention that? To some extent, to some extent. I mean, he was ---- you know, he was impeached with that. But ultimately, it came down to the jury's resolution of the question, who's telling the truth about the touching? The touching was admitted. The question was, was it harmless, just an attempt to make her more comfortable while she's sleeping on the couch, or was it sexual abuse? And that's what the jury, the jury accepted. The purpose of the government bringing this out was to simply discredit him. That's correct. And to, you know, persuade the jury that he should not be believed and that the young victim is telling the truth. That's correct. But, Your Honor, I think ---- In that context, how ---- I realize the burden. When you're reviewing for plain law, the burden is on ---- That's correct. ---- is on the defendant to present, to persuade the court that his substantial rights have been violated as opposed to when it's just direct review. Yes. And I don't think, even if you admit that there was error and that it was plain, it doesn't seem to me that his substantial rights were violated precisely because it was peripheral to the basic conflict in the evidence, what kind of touching took place. And also, you know, and the fourth prong of the plain error test is, does this lead to a miscarriage of justice? And it certainly does not because the jury's questions of what kind of touching took place. Was it sexual abuse or was it an attempt to make the girl comfortable? In that connection, I have one more question about the closing argument. That supplemental excerpt of Record 198 is where I am. One of the statements made in the closing argument was, if there was no proof beyond a reasonable doubt, ladies and gentlemen, we wouldn't be here. Samantha herself is the proof beyond a reasonable doubt. Why isn't that impermissible statement of the prosecutor's own personal view of the strength of the evidence or a form of vouching for Samantha as I believe her, so should you? Well, I think the, you know, I think Judge, the district judge, Judge Siebel, was in the best position to judge whether that was vouching or not. And he didn't consider it vouching, and he applied the test. Was it a personal assurance by the government, you know, about this, or was it a representation of information not before the jury supported the verdict? I think what you, if you look at the, at the transcript, what you see is this. First of all, it's not a, it's, the reference is to her testimony. And actually, what that does is picks up on Judge Siebel's ruling on the Rule 29 motion at the close of the government's case, where he said, you know, the testimony of the victim standing alone is enough to allow a reasonable jury to convict. And what she, and all that the prosecutor did in closing argument is come back to that, to the district judge's formulation, that the testimony of the witness standing alone is, is the, is sufficient to convict. Actually, that was not, you know, I mean, it's important to realize that her testimony was corroborated, you know, by the effect of what happened. Her mother testified to that effect. The police officer testified to that effect. What do you mean by effect? The impact, her, her emotional state after she left the Hill residence. You know, in the car, her mother saw that. The police officer who stopped by and asked if anything was wrong and saw that something obviously was wrong. And then the examining physician at the emergency room, and also the examining the, the emergency room nurse. All of these people offered corroboration as to her emotional state. And I think you can imagine where the jury would say, well, if nothing happened, why was she so upset? And I think so. It doesn't, it's not just her testimony standing alone. It's corroboration, you know, by these other four witnesses. And so I think, again, and that goes back, Your Honors, to the, to the plain error question on the, on the Miranda situation. You know, here's this evidence, this corroborating evidence. You don't have a miscarriage of justice here. You have the witness's testimony, and then you have it corroborated, at least to her emotional state, by four other independent witnesses. And, and one of them, obviously, is her mother. But then there's a police officer and two medical personnel who testify to her emotional state, which suggests that what happened was not a rearrangement, you know, so that she might sleep more comfortably, but rather was the abuse charged in the indictment. And I, I apologize to the Court. I don't believe Mr. Woodward cited Doyle. But if he did, I missed it, because otherwise I would have dealt with it in my brief. And I'm sorry. I tried to deal with the Court, the cases that I, that I thought I said. Kennedy. I think it's important for you to deal with the third element of Olano, which is the miscarriage, the effect on the substantial rights of the defendant. You mentioned that there's corroboration by four independent witnesses of what S.W. testified to. Now, what, what I say is, is that they testified to her emotional state after the incident. The mother testified, you know, she's in the car with her mother. Her mother senses something's wrong, and she is upset. A police officer, you know, they, they pull the car over because they're so upset. A police officer stops by and says, what's the matter? And they say, nothing's the matter. He says, well, obviously something's the matter. And so they tell him what's the matter. And he says, you'll have to come into the station and make a statement. And then they take her to the clinic. And there she's examined by a physician, Dr. Moore, and then the emergency room nurse. And they testified to her emotional state. But corroboration was an emotional state consistent with her having related a sexual encounter. That's right. Well, consistent with the results of, you know, someone being upset after having a sexual encounter. What? An 11-year-old girl. Or having related a sexual encounter which, perhaps, consistent with her past history, didn't take place. Well, Your Honor, I, it would, they found, they thought that she was genuine. They thought that this was not a fake emotional state, that it was, in fact, a genuine, you know, and severe emotional reaction, you know, to this incident. And, therefore, it was, and I, that's what it corroborates. And, okay? If the Court would like me, I would be happy to submit supplemental something on Doyle. I just, I'm disappointed in myself. I just, if you let me, I missed it. I'm sorry. I don't think we require supplemental briefing. Okay. The sentence. The, I mean, this is a sad case. You got a 60-year-old retired police officer with health problems. But, on the other hand, you have an abused and traumatized 11-year-old girl. And I think the sentence reflects the District Court's reasonable balancing of all, all of the relevant facts in this situation. Mr. Woodward, you know, has said that the judge really didn't consider the Section 3553A factors. He did. When you look through the transcript and you see, obviously, the big thing here is the nature of the offense, the seriousness of the offense. And Judge Siebel made a judgment that, you know, you have molestation. The offense argument was, well, this was just, this was touching, this was not rape. But Judge Siebel's perception was that it had the same effect on the victim as though she were forcibly raped. So that's, that's a significant factor. He took into account in sentencing Mr. Hill's personal situation, his health, his age, his clean record. Obviously, the guidelines, you know, take that into account. Before you sit down, let me just ask you one question. I don't mean to really interrupt you, but just bear with me a second. You know, the Supreme Court has a couple of sentences. Yes. Read it in Claiborne. Read it in Claiborne. We have an en banc on Zavala, Cardin. Yes, in Cardin. Would it be prudent in your estimation on the sentencing issue here to wait to see what the Supreme Court has to say about the role of the guidelines, how the guidelines should play out in this whole process? I think, I think it might be excessively prudent. I think because here the presumption of reasonableness was not applied. The district court talked about it, but recognized that the court, that the Ninth Circuit, you know, had not yet ruled authoritatively on the matter, and then clearly went through not just, well, let's just have a guideline sentence. He went through why he was why he had this sentence, why it was here in the guidelines. It was all very fact-specific, this defendant, you know, this victim, these psychological  Thank you very much, Your Honor. Thank you. You have considerable rebuttal time remaining. Thank you, Your Honor. If I might go back to the Fifth Amendment issue and the Doyle case. We didn't cite Doyle directly, but we did refer the Court to its decision in Velarde Gomez, which relies on Doyle. And with regard to plain error, it seems to me that this Court has already recognized in Guam v. Valoria that comment on the defendant's silence is, in fact, error, is clear and obvious, and then you look whether or not it affected his substantial rights. That seems to be the point at which the government focuses its argument, to say the kind of a tertiary issue. It just wasn't that important in comparison to all the other issues in the case. Well, I understand what you're saying, but I disagree. I mean, obviously, what the jury was tasked with deciding was whether or not there had been an illegal touching. But how do they do that when you have someone saying black and others saying white? How do they determine? Well, I mean, the Court instructs every jury on how to determine credibility, and one of the things they would have considered was this very testimony that Gerald White is now, Gerald Hill is now tailoring his testimony. He had the opportunity to tell the police that this situation didn't look like this, but he refused to. I mean, and when you couple that not only with testimony but with argument, I mean, the clear inference is that he is not to be believed, and therefore, when he says white, you can't believe that. It's really black, like this child says. And, you know, this was not a case that the jury went out, had a cup of coffee, and came right back. They sent a note to the Court saying they were deadlocked. What do we do now? It was obvious that there was some difficulty reaching a decision. Can I tell you for certain that the 12 jurors said, you know, Hill made stuff up, he should have told the cops initially? No, but I think it likely that that was a substantive factor. Now, I also want to talk about sentencing. I know that the presumption of reasonableness was raised by me. I know that you have now accepted that issue en banc. I know the Supreme Court has granted cert in the Rita and Claiborne cases to deal with those very issues, and that, I mean, it would be kind of silly for you guys to issue a decision until at least the en banc decision is out, and probably not until the Supreme Court. But I don't think you need to deal solely with Judge Siebel having indicated that in his opinion there was a presumption of reasonableness. I think that you are tasked with looking at the record and deciding whether or not the sentence itself is reasonable. And I like Judge Siebel. He is a very bright, decent judge. But it's pretty obvious if you read the record that he did just wink at the 3553 factors other than the guidelines. He started the sentencing hearing by essentially telling me I was spinning into the wind. I'm not going to depart from the guidelines. Now go ahead and do whatever it is you want to do. So, you know, and to determine whether or not factors warrant this much of a sentence or a lesser sentence, it seems to me the judge has to engage in a fact-finding process. And certainly I appreciate that he read my brief and that he took what I said into account. But, you know, what I say is not evidence. And you can't make a factual finding upon the hearing, or at least you shouldn't make a factual finding upon the arguments of counsel. You ought to listen to the witnesses. You ought to look at the evidence and make those decisions. And it's pretty clear that he didn't do any of that, that he had determined what the sentence was going to be well in advance of any evidence being presented. And given Gerald Hill, in terms of his background, his career, and maybe most significantly his health, imposing a sentence that is roughly three times his life expectancy seems to me, if that's not unreasonable in a case less than homicide, I don't, I mean, maybe there is no such thing as an unreasonable sentence. Help me on this. 135 months was imposed, right? Yes. And that's three times his life expectancy? How old is he? The evidence presented through his doctor is that he has congestive heart failure and that he has about a four- to five-year life expectancy. He's in his early 60s, correct? Yes, he's in his early 60s. And, you know, he has a variety of other health issues as well, but the congestive heart failure is the most significant. And, you know, I mean, the odds are if you postpone, if you're going to determine this case on a sentencing issue, if you postpone considering this until the Supreme Court has ruled, I mean, it may be moved. Mr. Hill may be dead. He's been incarcerated for over a year now. And, you know, anybody who has been in the system knows that a year of incarceration is a lot harder than a year of freedom. So I urge you not to take the easy way and sit and wait. Thank you, Your Honors. Thank you. The case just argued is submitted.
judges: Graber, Paez, Bea